# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| AJ KWIATKOWSKI, ASHLEE INSCOE , PUMPKIN SNUGGS, LULUBELL FRAZIER and TREMAYNE IZZARD, individually and on behalf of a class of similarly situated persons, <br><br> *Plaintiffs,* <br><br> v. <br><br> LESLIE COOLEY DISMUKES, in her official capacity as Secretary of the North Carolina Department of Adult Correction, and ARTHUR "LES" CAMPBELL, in his official capacity as Medical Director of the North Carolina Department of Adult Correction, <br><br> *Defendants.* | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Case No. _____ |

## INTRODUCTION

1.     Plaintiffs and the putative class they seek to represent are incarcerated by the North Carolina Department of Adult Correction ("DAC"). Plaintiffs have all been diagnosed with gender dysphoria, a serious condition involving clinically significant distress or impairment resulting from an incongruency between a person's gender identity and the sex they were assigned at birth. Plaintiffs have sought and received gender-affirming medical treatment from DAC to alleviate their gender dysphoria.

2.     Plaintiffs now face the imminent loss of essential healthcare due to the enactment of 2025 NC Sess. Laws 84 § 3(b1), ("HB805"), which prohibits the use of state funds "for the performance of or in furtherance of surgical gender transition procedures,

or to provide puberty-blocking drugs or cross-sex hormones to any prisoner incarcerated in the State prison system."

3. HB805 only permits gender-affirming hormone therapy or surgery if, absent that treatment, a patient will experience "imminent physical harm," with no consideration of a patient's mental or behavioral health or longer-term physical consequences. It provides no exceptions for a patient's mental health.

4. HB805 presents a medically unjustified barrier to gender-affirming medical care in North Carolina prisons regardless of an individual patient's needs. To allow gender-affirming care only when a patient faces imminent physical harm is a gross departure from the standard of care and has no basis in sound medical practice.

5. Major medical associations agree that gender dysphoria is a serious medical condition, the symptoms of which can be debilitating and life-threatening. Treatment for gender dysphoria, including hormone therapy and gender-affirming surgery, is highly effective, and withholding such treatment presents substantial risks of significant psychological and physical harm.

6. For over a decade, DAC policy authorized gender-affirming care based on individualized determinations of medical necessity. HB805 overrides that policy and prohibits medically necessary care to treat gender dysphoria without due regard to a patient's individual needs, in violation of the Eighth Amendment to the Constitution.

7. Plaintiffs and the putative class they represent seek declaratory and injunctive relief striking down Section 3(b1) of HB805 as unconstitutional, prohibiting Defendants' enforcement of the law, and requiring Defendants to once again provide access to medically necessary gender-affirming care based on individual patient needs and the widely accepted standard of care for treating gender dysphoria.

2

## JURISDICTION AND VENUE

8.      Plaintiffs bring this action under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution.

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which provides federal district courts original jurisdiction in civil actions to redress the deprivation, under color of any State law, of any right secured by the U.S. Constitution or federal law, and 28 U.S.C. § 1343(a)(3), which provides federal district courts original jurisdiction in civil actions to redress the deprivation, under color of state law, of any right secured by the U.S. Constitution.

10.     The Court has personal jurisdiction over Defendants as residents of North Carolina.

11.     Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Western District of North Carolina.

## PARTIES

### **Named Plaintiffs**

12.     **Plaintiff AJ[1] Kwiatkowski** is a 38-year-old transgender man with gender dysphoria currently incarcerated at Anson Correctional Institution. He first understood he was a boy at nine years old. Mr. Kwiatkowski was diagnosed with gender dysphoria at age sixteen and was first prescribed hormone therapy in 2018. In 2019, Mr. Kwiatkowski successfully underwent top surgery. He entered DAC custody in 2023, where his hormone

---

[1] Though AJ is Mr. Kwiatkowski's legal first name, some DAC records reflect a former first name of "Amanda." Mr. Kwiatkowski will be referred to as AJ throughout the course of this litigation. His DAC identification number is 1723555.

Case 3:26-cv-00098     Document 1     Filed 02/06/26     Page 3 of 26

therapy was eventually continued, but at a lower dosage than in the community. In 2025, Mr. Kwiatkowski underwent a successful hysterectomy, unrelated to his gender dysphoria diagnosis. Hormone therapy has been critical to Mr. Kwiatkowski's mental and physical health.

13.    **Plaintiff Ashlee[2] Inscoe** is a 45-year-old incarcerated person. She identifies as a woman but was assigned male at birth. Though her parents gave her a boy's name and raised her as a boy, she knew since childhood that she was a girl. She is diagnosed with gender dysphoria and is currently incarcerated at Nash Correctional Institution. She has been receiving hormone therapy in DAC custody continuously since 2019. In 2022, she underwent a gonadectomy while in DAC custody, which significantly impacted her body's hormone production. Hormone therapy has been and remains critical to Ms. Inscoe's mental and physical health. Before the passage of HB805, she had formally requested that DAC provide her with a vulvoplasty.

14.    **Plaintiff Pumpkin[3] Snuggs** is a 50-year-old transgender woman with gender dysphoria currently incarcerated at Southern Correctional Institution. She was first diagnosed with gender dysphoria in 2016 while at Lanesboro Correctional Institution, now Anson Correctional Institution. She has been prescribed and taking hormones since 2017. Hormone therapy has been critical to Ms. Snuggs' mental and physical health.

---

[2] Ashlee is Ms. Inscoe's preferred name, and she will be referred to as such in this litigation. Her legal name in DAC's files is William Inscoe, and her DAC identification number is 0568587.

[3] Pumpkin is Ms. Snuggs' preferred name, and she will be referred to as such in this litigation. Her legal name in DAC's files is Tony Snuggs, and her DAC identification number is 0626933.

15. **Plaintiff LuluBell[4] Frazier** is a 49-year-old transgender woman with gender dysphoria currently incarcerated at Southern Correctional Institution. She has identified as a woman for most of her life and attempted to transition in the community on her own before her incarceration in 2011. In 2021 she was diagnosed with gender dysphoria in DAC custody, at which point she formally sought hormone therapy. She began seeking gender-affirming surgery shortly thereafter. Ms. Frazier was first prescribed hormones in DAC custody in 2022. Hormone therapy has been critical to Ms. Frazier's mental and physical health, and she continues to pursue gender-affirming surgery from DAC.

16. **Plaintiff Tremayne[5] Izzard i**s a 48-year-old transgender man with gender dysphoria currently incarcerated at Anson Correctional Institution. While he did not have words for his feelings about his gender as a child, he always played with other boys, and his gender identity has always been male. He came to accept this identity in his twenties, eventually changing his first name and beginning hormone therapy in or around 2012-2013, before entering DAC custody. During his incarceration, Mr. Izzard requested and received accommodations, including hormone therapy. DAC approved a hysterectomy surgery for non-gender affirming reasons in May 2021. Hormone therapy has been critical to Mr. Izzard's mental and physical health. Mr. Izzard continues to need accommodations including top surgery to treat his gender dysphoria..

---

[4] LuluBell is Ms. Frazier's preferred name, and she will be referred to as such in this litigation. Her legal name in DAC's files is Michael Frazier, and her DAC identification number is 0966292.

[5] Mr. Izzard's OPUS number for identification purposes is 1497492.

**Class of Incarcerated People**

17.     Plaintiffs bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

18.     This class is defined as: All current and future people in DAC custody who have or will have gender dysphoria, and have been prescribed or may require cross-sex hormone therapy or gender-affirming surgery to treat gender dysphoria.

19.     As defined, the class meets all the requirements of Rule 23(a).

20.     The class is so numerous that joinder of all members is impracticable. Upon information and belief, dozens of people in DAC custody have active prescriptions for hormone therapy to address their gender dysphoria which are at risk of sudden and unjustified discontinuation due to HB805. Upon information and belief, there are hundreds of people currently incarcerated with DAC who have self-identified as transgender and are seeking accommodation of any kind through the Division Transgender Accommodation Review Committee ("DTARC") process, and who may require gender-affirming medical care in the future but will be unable to receive it due to HB805.

21.     What's more, additional class members will enter DAC custody in the future. They too will be unable to receive gender-affirming medical care due to HB805, regardless of whether such care is medically necessary to treat their gender dysphoria, or whether they enter the system with active prescriptions for such care.

22.     Pursuant to HB805, Defendants are acting on grounds that apply generally to the class, as they no longer provide medically necessary gender-affirming care to

6

members of the class based on individualized assessments of patient needs, including mental health needs, according to the widely accepted standard of care.

23. There are questions of law or fact common to the class, including whether gender dysphoria is an objectively serious medical condition, and whether Defendants are being deliberately indifferent to Plaintiffs' objectively serious medical conditions by basing treatment on the criteria in HB805 and not individual patient needs, including risk of psychological harm.

24. All members of the class seek common relief: an injunction preventing the enforcement of Section 3(b1) of HB805 and a declaration that its prohibitions are unlawful. Whether that provision violates the Eighth Amendment involves common questions of law that will have common answers for every class member.

25. Plaintiffs' claims are typical of those of the class. They are all incarcerated people who have gender dysphoria. Each has received gender-affirming medical care from DAC in the past and, but for HB805, would continue to receive that care.

26. Plaintiffs are adequate representatives of the class. They do not have conflicts with other members of the class, they seek the same relief as other members of the class, and they will represent the class fairly and adequately. Further, at least one Plaintiff has fully exhausted their available administrative remedies regarding the implementation and enforcement of HB805.

27. The class representatives are also adequately represented by counsel. Counsel are lawyers from the American Civil Liberties Union of North Carolina Legal Foundation and EmancipateNC. Counsel have extensive experience litigating civil rights lawsuits, including class actions and lawsuits on behalf of transgender people and incarcerated people.

28.     In the alternative, Plaintiffs seek certification of two classes:

a.     All current and future people in DAC custody who have or will have gender dysphoria and have been prescribed or may require cross-sex hormone therapy to treat gender dysphoria (the Hormone Class).

b.     All current and future people in DAC custody who have or will have gender dysphoria and have been prescribed or may require gender-affirming surgery to treat gender dysphoria (the Surgery Class).

29.     Certification of these classes would be appropriate for the same reasons alleged above.

**Defendants**

30. **Defendant Leslie Cooley Dismukes** is the Secretary of DAC. She is responsible for overall operations of North Carolina's prisons. She has a legal duty to provide needed health care to all persons in DAC custody. She is sued in her official capacity under 42 U.S.C. § 1983 for violations of Plaintiffs' Eighth Amendment rights.

31. **Defendant Dr. Arthur "Les" Campbell** is the Medical Director for DAC. He is responsible for oversight of the day-to-day operations of medical services and for the quality of medical services provided to all persons in DAC custody. Defendant Campbell has a legal duty to provide needed health care to all persons in DAC custody. Upon information and belief, Defendant Campbell is responsible for the issuance of directives for the enforcement of HB805 as it concerns prison medical care. He is sued in his official capacity under 42 U.S.C. § 1983 for violations of Plaintiffs' Eighth Amendment rights.

8

# FACTUAL ALLEGATIONS

## I.     Gender Identity and Gender Dysphoria

32.     "Gender Identity" is a well-established medical concept, referring to a person's deeply felt, internal sense of their own gender, e.g. being male, female, or non-binary.

33.     All human beings develop and possess a gender identity. It is a core part of identity that cannot be altered by choice or by external factors.

34.     Typically, people who are assigned female at birth based on their external anatomy identify as girls or women, and people who are assigned male at birth based on their external anatomy identify as boys or men. Individuals with a gender identity congruent with the sex they were assigned at birth are cisgender.[6] A cisgender man, for example, is a person who was assigned male at birth and who has a male gender identity.

35.     Transgender people have a gender identity that differs from the sex assigned to them at birth. A transgender woman is a woman who was assigned male at birth but who, like a cisgender woman, has a female gender identity. A transgender man is a man who was assigned female at birth but who, like a cisgender man, has a male gender identity.

36.     While being transgender itself is not a disorder, the incongruence between one's gender identity and sex assigned at birth can cause clinically significant distress for many transgender people.

---

[6] The terms "sex assigned at birth" or "sex designated at birth" are more precise than the term "biological sex" because there are many biological sex characteristics, and they do not always align with each other.

9

37.    "Gender dysphoria" is the medical diagnosis for a condition involving clinically significant distress and impairment resulting from the incongruence between one's gender identity and one's sex assigned at birth. To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.[7]

38.    If untreated or inadequately treated, gender dysphoria can lead to serious harm. These harms include clinically significant psychological distress, impairment of basic life activities, and debilitating depression. Untreated or inadequately treated gender dysphoria is also associated with higher risks of experiencing unemployment, homelessness, victimization, and involvement in the criminal legal system. For some individuals, not receiving necessary treatment for gender dysphoria results in self-harm, suicidal ideation, suicide, and death.

39.    The widely accepted approach to the treatment of gender dysphoria seeks to resolve the distress associated with the incongruence between a transgender person's designated sex at birth and their gender identity by enabling the individual to live consistently with their gender identity. This can involve social transition (such as dressing, styling one's hair, and using a name and pronouns that match one's gender identity); hormone treatment to masculinize or feminize the body; and various surgeries to change primary and/or secondary sex characteristics. The particular course of medical treatment varies based on the individual needs of the patient.

---

[7] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Text Revision F64.0 (5th ed. 2022).

40.     While psychotherapy can be important to support individuals with gender dysphoria, psychotherapy is not a substitute for medical treatment of gender dysphoria when medically indicated.

41.     Medical treatment for gender dysphoria, such as hormone therapy and surgery, may become necessary for a patient when other measures such as social transitioning and psychotherapy prove ineffective at resolving the incongruence between a patient's gender identity and their sex assigned at birth and the mental distress associated with that incongruence. For these patients, only modifying their primary or secondary sex characteristics to align them with their gender identity through hormone therapy and/or surgery will alleviate their distress. Upon information and belief, no major medical association endorses only providing gender-affirming hormone therapy or surgery based exclusively on whether a patient would experience imminent physical harm.

42.     The efficacy of gender-affirming health care in alleviating gender dysphoria is well-documented in decades of peer-reviewed research and clinical experience. Gender-affirming hormone therapy and surgeries are also well-documented to have low risks that are comparable to the risks associated with other types of medical treatments.

43.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published clinical practice guidelines for gender dysphoria treatment. WPATH is an international professional organization focused on transgender healthcare with a membership of medical and mental health professionals who specialize in the diagnosis and treatment of gender dysphoria. WPATH has been issuing treatment guidelines since 1979, and the current version, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 ("SOC 8") was published

11

in 2022.[8] The Endocrine Society is a professional association of endocrinologists. It first issued guidelines for the treatment of gender dysphoria in 2011 and updated those guidelines in 2017.[9]

44.   These clinical practice guidelines are broadly supported by leading medical and mental health professional associations and organizations, including the American Medical Association, the American Psychological Association, and the American Psychiatric Association, among others.

45.   "All of the recommendations of the [SOC 8] apply equally" to people living in a carceral setting.[10] Further, the National Commission on Correctional Health Care's Position Statement on Transgender and Gender Diverse Health Care in Correctional Settings recommends that "screening, referral, and management of medical and mental health care . . . for gender dysphoria should follow accepted standards developed by professionals with expertise in transgender health," and "should be on an individualized case-by-case basis."[11]

46.   Withholding gender-affirming health care from people for whom it is medically necessary puts them at risk of significant harm to their health. For people who are already receiving care, such as hormone therapy, withholding this care typically

---

[8] Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int. J. of Transgender Health S1 (2022), available at https://wpath.org/publications/soc8/.
[9] *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice guideline*, 102 J. of clinical Endocrinology & Metabolism 3869 (2017), https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence.
[10] *See* SOC 8 at S104; *See generally Id.* at Chapter 11.
[11] National Commission on Correctional Health Care, Position Statement: Transgender and Gender Diverse Health Care in Correctional Settings 3, (2020), available at https://www.ncchc.org/wp-content/uploads/Transgender-and-Gender-Diverse-Health-Care-in-Correctional-Settings-2020.pdf.

results in the return of distressing gender dysphoria symptoms. Some of the effects of hormone therapy are reversible, so discontinuing that treatment would cause transgender men to lose masculinization and transgender women to lose feminization of their features, further exacerbating their gender dysphoria.

47.     Sudden discontinuation of hormone therapy can also lead to physical symptoms, like headaches, hot flashes, and spikes in blood pressure.

48.     In circumstances where an individual no longer has naturally circulating sex hormones — for instance, when an individual has had a hysterectomy or gonadectomy — discontinuation of hormone therapy can have serious and long-lasting consequences such as loss of bone density and cardiac complications.

## II.     DAC's Process for Treating Gender Dysphoria before HB805

49.     DAC's policy, "Evaluation and Management of Transgender Offenders," ("EMTO Policy" or "Policy") establishes the process for the care and treatment of incarcerated transgender people suffering from gender dysphoria. Upon information and belief, DAC has had some version of this policy since 2013. The current version of the EMTO Policy was issued June 2, 2023.[12] Among other things, requests for gender-affirming medical care were made through the process established in the EMTO Policy.

50.     "Routine Accommodation" requests include requests for social transition items and considerations related to housing, as well as continuation of hormone therapy (if prescribed immediately before incarceration).[13] Routine Accommodation requests including continuation of hormone therapy were evaluated by a Facility Transgender

---

[12] DAC Division of Institutions Policy and Procedure Manual, *Evaluation and Management of Transgender Offenders,* Chapter F, §.4300 (2023), available at https://public.powerdms.com/NCDAC/tree/documents/2050350.
[13] *Id.* at 2.

Accommodation Review Committee ("FTARC"), in consultation with the warden of the facility.[14] Each FTARC "includes representatives from psychiatry (as needed), behavioral health, primary care provider, nursing administration, (Associate Wardens for custody and operations/programs), unit manager, and the facility PREA [Prison Rape Elimination Act] Compliance Manager."[15]

51.     "Non-Routine Accommodation" requests include, but are not limited to, initiation of hormone therapy and gender-affirming surgery. [16]

52.     "Non-Routine Accommodation" requests and appeals from decisions made by FTARC are considered by the Division Transgender Accommodation Review Committee ("DTARC").[17] According to the EMTO Policy, DTARC must include "at a minimum, the Medical Director[18], Chief of Psychiatry, Behavioral Health Director, Director of Rehabilitative Services, and the PREA Director."[19]

53.     The Policy required that DTARC refer its recommendations regarding surgical intervention to the Deputy Secretary of Institutions and Deputy Secretary of Comprehensive Health Services for final determination.[20]

54.     Decision-making under the EMTO Policy was supposed to require individualized review and consideration on a case-by-case basis.[21]

---

[14] *Id*. at 5.
[15] *Id*. at 2.
[16] *Id*. at 6.
[17] *Id*.
[18] Upon information and belief, despite the written policy, the current DAC Medical Director is no longer involved in the DTARC process.
[19] *Id*. at 2.
[20] *Id*. at 6.
[21] *Id*.

55.    In 2024, this Court held that, despite DAC's written policy, due to the influence of Medical Director Defendant Campbell, DAC was operating under a de facto ban on gender-affirming surgery. The Court found Defendant Campbell's testimony to the contrary not credible. Defendant Campbell had never authorized gender-affirming surgery, had written a "position statement" that gender-affirming surgery is never medically necessary for anyone, and campaigned to make that position DAC's official policy. Other members of the DTARC deferred to Campbell's view on this issue.[22]

56.    The Court held that this de facto ban against gender affirming surgery violated the Eighth Amendment's requirement for an individualized medical evaluation.[23]

### III.   HB805 Creates Medically Unjustified Barriers to Gender-Affirming Medical Care for Transgender People in DAC Custody

57.    On April 7, 2025, the North Carolina House of Representatives introduced HB805, short titled "Prevent Sexual Exploitation/Women and Minors," a bill designed to regulate the dissemination of pornographic imagery and allow people appearing in sexually explicit photos and videos to have them removed.

58.    On June 18, 2025, a committee substitute to HB805 was adopted by the Senate which included provisions impacting transgender North Carolinians.

59.    New Section 3.(a) of HB805 sought to modify the text of N.C. Gen. Stat § 143C-6-5.6 to include:

> (b1) No State funds may be used directly or indirectly, for the performance of or in furtherance of surgical gender transition procedures, or to provide puberty-blocking drugs or cross-sex hormones to any prisoner incarcerated in the State prison system or the Statewide Misdemeanor Confinement Program or otherwise in the custody of the Department of Adult correction,

---

[22] *Zayre-Brown v. N.C. Dep't of Pub. Safety,* No. 3:22-CV-191-MOC-DCK, 2024 WL 1641795, at *3 (W.D.N.C. Apr. 16, 2024), *vacated as moot sub nom Zayre-Brown v. N.C. Dep't of Adult Corr.*, No. 24-6477, 2024 WL 4925046 (4th Cir. Nov. 25, 2024).
[23] *Id.*

or to support the administration of any governmental health plan or government-offered insurance policy offering surgical gender transition procedures, puberty-blocking drugs, or cross sex hormones to any prisoner incarcerated in the State prison system or the statewide Misdemeanor Confinement Program or otherwise in the custody of the Department of Adult Correction. Nothing in this subsection shall be construed to prevent State funds from being used, directly or indirectly, to address medical complications resulting in imminent physical harm, including the treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by a previously performed or privately funded gender transition procedure.

(underline in original).

60.    According to N.C. Gen. Stat § 143C-6-5.6, the definitions of N.C. Gen. Stat. § 90-21.150 govern.

61.    In HB805, "surgical gender transition procedure" therefore means "any surgical service . . .  that seeks to do any of the following for the purpose of effecting a gender transition: a. Alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex. B. Instill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex."

62.    In HB805, "cross-sex hormones" means "supraphysiologic doses of testosterone or other androgens to members of the female biological sex or supraphysiologic doses of estrogen or synthetic compounds with estrogenic activity to members of the male biological sex when used for the purpose of assisting an individual with a gender transition."

63.    Under these definitions, HB805 only outlaws these medical procedures when they are gender-affirming, that is, when they are for the purpose of treating the incongruence between one's sex assigned at birth and their gender identity, as is characteristic of gender dysphoria.

16

64.     On June 26, 2025, the North Carolina General Assembly ratified the version of HB805 containing Section 3.(a).

65.     Per Section 3.(b) of HB805, Section 3.(a) had an effective date of July 1, 2025.

66.     On July 3, 2025, Governor Josh Stein vetoed HB805, calling the legislation "mean-spirited" and noting that it "marginaliz[es] vulnerable North Carolinians."[24]

67.     On July 29, 2025, both chambers of the North Carolina General Assembly overrode Governor Stein's veto of HB805. HB805 became law, and Section 3.(a) became effective immediately.

68.     HB805's funding restrictions make it unlawful for DAC to provide gender-affirming medical care to treat the gender dysphoria of individuals in its custody in accordance with sound medical, mental, and behavioral health judgment.

69.     To comply with HB805, DAC has instead imposed protocols that grossly deviate from the standard of care, creating an unreasonable risk of harm to patients — and in many cases, causing them harm — for non-medical reasons and with no legitimate penological purpose.

70.     Upon information and belief, Defendant Campbell has issued directives on the implementation of HB805 that require individuals to undergo an "evaluation" to determine whether "medical complications resulting in imminent physical harm" will result from discontinuation of hormone therapy. This evaluation consists of removing people from their hormone therapy to determine whether they will have harmful physical

---

[24] Governor Josh Stein Objections and Veto Message, HB805, (July 3, 2025) available at https://webservices.ncleg.gov/ViewBillDocument/2025/7265/0/H805-BD-NBC-16791.

side effects, and placing them back on hormone therapy only if harmful physical side effects are reported. The directives do not indicate how often such evaluations will occur.

71. Plaintiffs and putative class members have a reasonable basis to fear that they will be subject to re-evaluation each time their hormone therapy prescription is up for renewal — typically every six or twelve months.

72. Upon information and belief, under these directives, no individual requesting to initiate hormone therapy will be permitted that therapy unless without it they would experience "imminent physical harm."

73. Upon information and belief, based on these directives, mental and behavioral health consequences are no longer valid considerations for determining whether an individual should initiate or continue hormone therapy.

74. Upon information and belief, no directives have been issued governing the provision of gender affirming surgical care, and all requests for gender-affirming surgery are being denied on the basis of HB805.

## IV. HB805's Impact on the Named Plaintiffs

75. Since the enactment of HB805, Plaintiffs have consistently experienced anxiety, distress, and anguish because they have experienced temporary discontinuations and/or threats to discontinue their medically necessary prescriptions for gender affirming care. They fear that their care could be discontinued permanently at any time, but they do not know exactly when this will occur. They further fear that any surgical intervention that they seek would be totally foreclosed by HB805.

76. Each Plaintiff has experienced firsthand, and/or have heard reports about other incarcerated transgender people being prescribed reduced dosages of their gender affirming prescription medications in preparation for a full cessation of their

prescriptions. Others have heard of or experienced immediate cessation of their medication, with detrimental physical and mental effects.

### AJ Kwiatkowski

77. Mr. Kwiatkowski was informed in October 2025 that his hormone therapy would have to stop due to HB805.

78. Mr. Kwiatkowski's weekly testosterone dosage was changed to every two weeks.

79. He was informed this would continue for two months and then it would be terminated entirely.

80. In December, Mr. Kwiatkowski reported chest pain and sweating related to the tapering of his testosterone dose.

81. He also reported nausea, vomiting, diarrhea, decreased appetite, and decreased motivation since having his testosterone dose decreased.

82. Mr. Kwiatkowski additionally experienced a worsening of his gender dysphoria, mood swings, and an overall worsening of his mental health due to this decrease.

83. On December 10, 2025, Dr. Wani met with Mr. Kwiatkowski and found continuation of his prior course of treatment would prevent medical complications that might result in imminent physical harm.

84. Mr. Kwiatkowski's hormone dosage was then changed in response to these symptoms; however he is still experiencing symptoms due to the low dose. He is fearful that he will have to undergo another "evaluation" period during which his hormone therapy could be reduced or stopped entirely, again needlessly subjecting him to painful and humiliating symptoms.

19

85.     Mr. Kwiatkowski remains anxious his testosterone may be discontinued suddenly and without notice due to implementation of HB805, and regardless of the medical, mental, and behavioral health consequences to him.

**Ashlee Inscoe**

86.     Post-gonadectomy, Ms. Inscoe's testosterone levels decreased significantly, with direct impacts upon bone density, muscle mass, body hair, voice, and body fat distribution. Hormone continuation is vital to maintain bone density, in addition to its vital role in treating her gender dysphoria.

87.     In December 2025, Ms. Inscoe was reevaluated by Dr. Wani for review of her hormone therapy. For now, Dr. Wani has allowed her to keep her hormone prescription due to the prospect of imminent physical harm, but she faces another evaluation in June 2026, and she has no assurance that this determination will not change in the future. She is anxious and worried that her hormones may be discontinued suddenly and without notice due to implementation of HB805, and regardless of the medical, mental and behavioral health consequences to her.

88.     In September 2025, Ms. Inscoe filed a grievance about HB805 to check on the status of her long-pending request for gender-affirming surgery (vulvoplasty). From the grievance response, she learned that her surgery request is denied because "no state funds may be used, directly or indirectly, for the performance of or in futerance [sic] of surgical gender transion [sic] procedures."

**Pumpkin Snuggs**

89.     In September 2025, Ms. Snuggs was taken off her hormone therapy cold-turkey. Her dosage was not titrated, and she was removed from the course of treatment entirely.

90.    Ms. Snuggs was informed by Dr. Wani that she was being taken off her hormones due to HB805.

91.    Ms. Snuggs did not experience physical side effects for the first several weeks, but she soon began experiencing significant side effects such as vomiting, diarrhea, and cold sweats, at which point she made emergency sick calls.

92.    Ms. Snuggs also initiated mental health calls. During one such call, she was informed she would continue to receive social transition tools, such as makeup, but DAC would no longer consider requests for gender-affirming surgery and would not put newly incarcerated individuals on hormone therapy.

93.    In December 2025, Ms. Snuggs met with Dr. Wani regarding her gender dysphoria treatment and was told DAC would resume her treatment.

94.    Ms. Snuggs was informed her treatment was resuming due to the physical complications she experienced.

95.    Ms. Snuggs remains fearful that her hormones will be discontinued suddenly and without notice due to HB805, and regardless of the medical, mental and behavioral health consequences to her.

**LuluBell Frazier**

96.    Ms. Frazier stopped receiving hormone therapy without explanation on or about August 1, 2025.

97.    On or about August 14, 2025, Ms. Frazier filed a grievance noting that she was experiencing withdrawal symptoms such as nausea, hot flashes, and mood swings as a result of not receiving her medication and requested that her hormone therapy medication be provided.

98.     On or about August 30, 2025, Ms. Frazier filed a grievance noting concern that HB805 had or would eliminate individualized assessments for gender-affirming care, such as the surgery that she has requested, within DAC.

99.     On or about September 3, 2025, the facility rejected Ms. Frazier's August 30 grievance as "[b]eyond control of agency," noting that any grievance "shall be rejected at any level if it . . . [c]hallenges matters beyond the control of the Department."

100.    In early September, Ms. Frazier's hormone therapy was continued without any explanation regarding why it had been withheld.

101.    Ms. Frazier remains on edge, anxious, and distressed at the thought that her hormones may be discontinued suddenly and without notice due to implementation of HB805, and regardless of the medical, mental and behavioral health consequences to her.

102.    Further, Ms. Frazier has yet to receive an individualized assessment for gender-affirming surgery and is anxious and distressed at the thought that HB805 has eliminated her ability to have such an assessment or to be considered for gender-affirming surgery to treat her gender dysphoria.

**Tremayne Izzard**

103.    Mr. Izzard was informed by Dr. Wani on October 20, 2025 that his hormone therapy would be lowered  for a few months and then stopped entirely due to HB805.

104.    Mr. Izzard's weekly testosterone dosage was reduced to every two weeks.

105.    In December, Mr. Izzard reported headaches, concentration issues, breast tissue issues, sleep issues, and mental health problems including agitation, anxiety, and depression, including worries about how his physical characteristics would change due to the reduction of his dose of hormone therapy. The reduction also worsened Mr. Izzard's feelings of gender dysphoria.

106.     Dr. Wani reinstated Mr. Izzard's hormone therapy dosage on December 12, 2025.

107.     Mr. Izzard remains anxious that his hormones may be discontinued suddenly and without notice due to implementation of HB805, and regardless of the medical, mental and behavioral health consequences to him.

108.     Additionally, though Mr. Izzard has received chest binders, which compress breast tissue to make one's chest appear more stereotypically masculine, as one of his accommodations, he continues to pursue top surgery to treat his gender dysphoria, as well as issues related to the long-term use of a binder, including pain and skin problems.

109.     Mr. Izzard is anxious and distressed at the thought that HB805 has eliminated his ability to be assessed or considered for gender-affirming top surgery to treat his gender dysphoria.

## CLAIM FOR RELIEF

### Cruel and Unusual Punishment in Violation of the
### Eighth Amendment to the U.S. Constitution

*Against Defendants Dismukes and Campbell in their official capacity*

110.     Plaintiffs incorporate the allegations in all preceding paragraphs as if stated fully herein.

111.     Under the Eighth Amendment, Defendants must provide people in DAC custody with adequate and necessary health care that meets community standards.

112.     Determination of what constitutes medically necessary care requires individualized assessments of patient needs.

113.     Intentionally removing individuals from their prescribed course of medically necessary treatment without medical justification constitutes deliberate indifference.

114.     A prohibition on the initiation or continuation of a particular course of medical treatment, regardless of an individual's medical, psychological, or behavioral health needs, constitutes deliberate indifference.

115.      An official who has knowledge of an incarcerated person's need for medical care that would place them at substantial risk of serious harm if not treated, and who denies, delays, or otherwise interferes with the provision of health care, is deliberately indifferent.

116.     Each Plaintiff has been diagnosed with gender dysphoria, a serious medical condition that causes clinically significant distress. Defendants know that absent adequate medical treatment, Plaintiffs are at substantial risk of serious physical and psychological harm.

117.     HB805 only permits gender-affirming hormone therapy or surgery if, absent that treatment, a patient will experience "imminent physical harm," with no consideration of a patient's mental or behavioral health or longer-term physical consequences. This requirement is a medically unjustified, gross deviation from both the widely accepted standard of care and DAC's policy before enactment of HB805.

118.     Subjecting patients to an "evaluation" — where prescribed hormone therapy is discontinued to see if the patient will experience physical harm — is a medically unjustified, gross deviation from both the widely accepted standard of care and DAC's policy before enactment of HB805.

119.     By withdrawing or forbidding medically necessary care for non-medical reasons and without a legitimate penological purpose, Defendants are subjecting Plaintiffs and putative class members to cruel and unusual punishment.

120.     Defendants have acted, and continue to act, with deliberate indifference to Plaintiffs' serious medical needs, subjecting Plaintiffs to a substantial risk of serious harm.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs requests that this Court grant the following relief:

A.     Certify a class of all current and future people in DAC custody who have been or will be diagnosed with gender dysphoria, and have been prescribed or may require cross-sex hormone therapy or gender-affirming surgery to treat gender dysphoria; appoint Named Plaintiffs as class representatives; and appoint undersigned counsel as class counsel.

B.     Issue a declaratory judgment that Section 3(b1) of HB805 and Defendants' enforcement thereof violate the Eighth Amendment.

C.     Enter preliminary and permanent injunctive relief prohibiting further enforcement of Section 3(b1) of HB805 by Defendants and requiring that appropriate and necessary medical care be provided to treat Plaintiffs and Class Members' gender dysphoria in accordance with DAC practice immediately before the enactment of HB805

D.     Award Plaintiffs their costs and reasonable attorneys' fees;

E.     Grant any other and further relief that this Court deems just and proper.

Respectfully submitted this the 6th day of February, 2026.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore
N.C. State Bar #50849
Daniel K. Siegel
N.C. State Bar # 46397
Ivy A. Johnson
N.C. State Bar # 52228
P.O. Box 28004
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
Raleigh, NC 27611
T: (919) 354-5070
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
ijohnson@acluofnc.org


*/s/ Elizabeth G. Simpson*
Elizabeth G. Simpson
N.C. State Bar # 41596
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
919-682-1149