| | |
|---|---|
| AJ KWIATKOWSKI, et al., | |
| *Plaintiffs,* | |
| v. | Case No. |
| LESLIE COOLEY DISMUKES, et al., | 3:26-cv-00098-SCR-WCM |
| *Defendants,* | |
| and | |
| PHILIP E. BERGER, et al., | |
| *Intervenor-Defendants.* | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants Dismukes and Campbell ("State Defendants" or "DAC") have filed a motion to dismiss. (D.E. 33). Defendants Berger and Hall ("Legislative Defendants" or "Intervenors") have moved for judgment on the pleadings. (D.E. 32). Collectively, Defendants raise three main arguments: Plaintiffs lack standing, have not exhausted their administrative remedies under the Prison Litigation Reform Act ("PLRA"), and have failed to state an Eighth Amendment claim. Each argument is meritless.

Plaintiffs have standing to challenge HB805's "imminent physical harm" requirement because they have already been injured by that provision, they will remain subject to it for the rest of their incarceration, and DAC will continue enforcing that provision in the future. These allegations establish a "credible threat of future enforcement." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (cleaned up).

1

Under the PLRA, administrative exhaustion is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 212 (2007). A plaintiff has no obligation to "to allege and demonstrate exhaustion in his complaint." *Id.* at 203. Defendants ignore this basic rule and improperly cite materials outside the complaint in making their arguments. And even if the Court considers those materials, they confirm that Plaintiffs satisfy the PLRA.

Finally, Plaintiffs plausibly state an Eighth Amendment claim. Plaintiffs allege that they have an objectively serious medical need of which Defendants are subjectively aware, and that HB805 imposes a medically unjustified barrier to adequate treatment. *See De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013). Nothing in this analysis changes because of *United States v. Skrmetti*, 605 U.S. 495 (2025). That case dealt exclusively with an equal protection claim concerning minors. This case involves a substantively distinct Eighth Amendment claim brought by adults.

Accordingly, the motions should be denied.

**FACTS**

**I. DAC has long acknowledged that gender dysphoria is a medical condition requiring treatment based on a patient's individual needs.**

The term "gender-identity" refers to one's internal sense of belonging to a particular gender and is a well-established medical concept. (D.E. 1 ¶ 32). All individuals develop this internal conviction of belonging to a particular gender. (*Id.* ¶ 33). For transgender and gender non-conforming individuals, this deeply felt sense of gender identity does not align with the sex they were assigned at birth. (*Id.* ¶ 35).

Gender dysphoria is a serious medical condition that some transgender and gender nonconforming people experience because of this disparity. (*See id.* ¶¶ 35–37). It involves (1) a marked incongruence between an individual's sex assigned at birth and

2

gender identity, (2) strong cross-gender identification, and (3) clinically significant distress or impairment of functioning. (*Id.* ¶ 37). Without adequate treatment, gender dysphoria can lead to debilitating psychological distress, self-mutilation, and suicide. (*Id.* ¶ 38).

Gender dysphoria is recognized by the American Psychiatric Association and other leading health organizations. (*Id.* ¶ 44). The World Professional Association for Transgender Health ("WPATH") publishes internationally accepted Standards of Care ("WPATH Standards") for treating gender dysphoria, as does the Endocrine Society. (*Id.* ¶ 43). The current WPATH Standards, published in 2022 as version 8, are the prevailing guidelines for medical professionals treating gender dysphoria. (*Id*).

The WPATH Standards establish treatment guidelines tailored to individual patient's needs. (*Id.* ¶ 45). Treatments include social transition, psychotherapy, gender-affirming hormone therapy, and gender-affirming medical procedures and surgeries to align an individual's primary sex characteristics (genitals) and/or secondary sex characteristics (e.g., breasts, facial hair) with their gender identity. (*Id.* ¶¶ 39–41).

Without adequate treatment, patients face significant risks of harm. (*Id.* ¶ 46). According to WPATH and the Endocrine Society, hormone therapy becomes necessary when social transitioning and psychotherapy prove ineffective in resolving a patient's dysphoria. For patients who have begun hormone therapy, ending it can have serious short- and long-term effects. Short-term effects typically include painful withdrawal symptoms such as chills, diarrhea, vomiting, cramps, and exacerbation of mental health symptoms. Long-term, post-surgical patients face risks of bone-density loss and cardiac complications. (*See id.* ¶¶ 46–48). For some patients, gender-affirming surgery becomes necessary if hormone therapy is not effective. (*Id.* ¶ 41).

3

For years, DAC has recognized that gender dysphoria is a real medical condition requiring individualized treatment. DAC policy has authorized treatments including hormone therapy or gender affirming surgery. (*Id.* ¶¶ 49, 51, 54). Imminent physical harm was not a requirement for any treatment. (*Id.* ¶ 49).

DAC's process for evaluating and treating patients for gender dysphoria has involved a multidisciplinary team of healthcare providers and prison administrators that reviewed the healthcare needs of prisoners diagnosed with gender dysphoria. DAC policy authorized accommodations and medical treatment, including hormone therapy and gender-affirming surgery, based on a patient's individual needs. *(Id.* ¶¶ 49–54). In 2024, this Court held that, despite DAC's written policy, Defendant Campbell was operating a de facto ban on gender-affirming surgery in violation of the Eighth Amendment. (*Id.* ¶¶ 55–56).

Here, all named Plaintiffs have been diagnosed with gender dysphoria, and all have been undergoing hormone therapy critical to their physical and mental health while in DAC custody. (*Id.* ¶¶ 12–16). Plaintiffs Frazier, Inscoe, and Izzard also had requests for gender-affirming surgery pending with DAC before the passage of HB805. (*Id.* ¶¶ 15, 88, 108).

## II. HB805 imposes medically unsound obstacles to adequate treatment for gender dysphoria.

On July 29, 2025, the North Carolina General Assembly overrode Governor Stein's veto to enact HB805. (*Id.* ¶ 67). Plaintiffs challenge Section 3.(a)(b1) of the Act, which prohibits the use of state funds towards gender affirming care, including hormone therapy and surgery, for any person incarcerated in a state prison unless they are at risk of "medical complications resulting in imminent physical harm." (*Id.* ¶ 59).

4

To comply with HB805, DAC imposed protocols that grossly deviate from the standard of care and DAC's previous policy. (*Id.* ¶¶ 49–54, 69). Defendant Campbell issued directives on the implementation of HB805 that require individuals to undergo an "evaluation" to determine whether "medical complications resulting in imminent physical harm" will result from discontinuation of hormone therapy. (*Id.* ¶ 70). These evaluations consist of removing individuals from their hormone therapy to assess whether they experience harmful physical side effects and placing them back on hormone therapy only if harmful physical side effects are reported. (*Id.*). Based on these directives, prisoners cannot initiate hormone therapy absent proof that without it they will experience imminent physical harm. (*Id.* ¶ 72). The directives do not mention surgery at all and do not allow DAC healthcare providers to account for a patient's mental health or long-term physical health when considering treatment. (*Id.* ¶¶ 73–74).

In the months after HB805 became law, Plaintiffs Kwiatkowski, Snuggs, Izzard, and Frazier had their gender-affirming hormone therapy reduced or cut off completely. (*Id.* ¶¶ 77–79, 89–90, 96–100, 103–106). Plaintiff Inscoe will have her hormone therapy reevaluated in June 2026. (*Id.* ¶ 87). DAC staff informed Plaintiffs Kwiatkowski and Snuggs that this was happening expressly because of HB805, and not because of a change in their medical circumstances. (*Id.* ¶¶ 77, 90). All experienced painful withdrawal symptoms including vomiting, diarrhea, cold sweats, and worsened effects of gender dysphoria. (*Id.* ¶¶ 80–81, 91, 97, 105).

DAC resumed these Plaintiffs' hormone therapy only after they experienced serious mental and physical pain. As with other prescription drugs, Plaintiffs must have their medications periodically renewed. (*Id.* ¶ 71). Plaintiffs are terrified they will have to

repeatedly endure this medically unnecessary "evaluation" to prove that they will experience physical harm without their medication. (*Id.* ¶¶ 71, 85, 87, 95, 101, 107).

As for surgery, Plaintiff Inscoe filed an administrative grievance in September 2025 to check on her longstanding request for gender affirming surgery. (*Id.* ¶ 88). In response, DAC denied the surgery request, citing HB805's prohibition on the use of state funds for such procedures. (*Id.*). Plaintiff Frazier also filed a grievance concerning surgery; DAC responded that the surgery had been denied as it was "[b]eyond control of agency" and that any grievance "shall be rejected at any level if it . . . [c]hallenges matters beyond the control of the Department." (*Id.* ¶ 99).

## STANDARD OF REVIEW

On Rule 12(b) and 12(c) motions, a plaintiff must allege facts that plausibly establish jurisdiction and state a claim for relief; courts must "accept all well-pleaded allegations of [a] complaint as true and draw all reasonable factual inferences in [the plaintiff's] favor." *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014). Consideration of extrinsic documents at this stage is only appropriate where the material considered supports a Rule 12(b)(1) motion for lack of subject matter jurisdiction, *see White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005), or "when the document is integral to and explicitly relied on in the complaint and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-607 (4th Cir. 2015) (cleaned up). Otherwise, "[c]onsideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment." *Id.* at 606.

6

I. **Plaintiffs have standing to challenge HB805's "imminent physical harm" requirement.**

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (ellipsis original) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016)). Defendants dispute the first and third factors.

**Injury in fact.** When plaintiffs "seek declaratory and injunctive relief, they must establish an ongoing or future injury in fact." *Id.* "An allegation of future injury may suffice if [it] is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Plaintiffs can satisfy this requirement by demonstrating a credible threat that a challenged statute will be enforced against them in the future. "[T]here is a credible threat of future enforcement so long as the threat is not imaginary or wholly speculative, . . . or wholly conjectural. Past enforcement . . . is good evidence that the threat of enforcement is not chimerical." *Id.* at 288 (cleaned up); *see also O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."). The threat of enforcement "is especially credible when defendants have not disavowed enforcement" of a statute in the future. *Kenny*, 885 F.3d at 288 (quotation marks omitted).

Moreover, in prison cases, plaintiffs typically have standing to challenge a policy when it has already caused them injury, and they will remain subject to the policy during their incarceration. For example, in *Johnson v. McCowan*, a prisoner had standing to

7

challenge a canine policy because the canines had recently injured him, and he would encounter canine officers more frequently in the prison environment. 549 F. Supp. 3d 469, 477–78 (W.D. Va. 2021). *See also Lehn v. Holmes,* 364 F.3d 862, 871 (7th Cir. 2004) (plaintiff had standing to challenge prison smoking policy because it "threaten[ed] his future health"); *Buffkin v. Hooks*, No. 1:18CV502, 2019 WL 1282785, at *3–4 (M.D.N.C. Mar. 20, 2019) (plaintiffs with hepatitis C had standing to challenge screening and treatment policy); *Hernandez v. Cty. of Monterey,* 305 F.R.D. 132, 149 (N.D. Cal. 2015) (plaintiffs who had been denied adequate medical care had standing to challenge policies concerning medical care and disability accommodation); *Ingles v. City of New York*, No. 01 CIV. 8279(DC), 2003 WL 402565, at *9 (S.D.N.Y. Feb. 20, 2003) (prisoners had standing to challenge use-of-force policy because they had been assaulted by and would remain "subject to the continual control of DOC staff").

Here, Plaintiffs bring a claim under the Eighth Amendment, which "protects against future harm . . . ." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Plaintiffs have already been injured by Defendants' implementation of HB805: DAC removed four Plaintiffs from their prescribed hormone therapy, which caused serious physical and psychological pain, and denied two Plaintiffs surgery, informing them that surgery would no longer be considered at all. DAC did all this expressly because of HB805. (D.E. 1 ¶¶ 77, 88, 90, 96, 99, 103). This recent and ongoing enforcement is "good evidence" that Plaintiffs face a real threat of future enforcement. *Kenny*, 885 F.3d at 28.

Moreover, Plaintiffs will remain subject to HB805 for the rest of their incarceration. Their hormone prescriptions will periodically have to be refilled, but they can only continue their hormone therapy if they satisfy HB805's imminent physical harm requirement. Three Plaintiffs are still seeking surgery. (D.E. 1 ¶¶ 88, 99, 108). Defendants do not

8

disavow any of this. Rather, they confirm that DAC will continue to evaluate prisoners'
needs for hormones under the imminent physical harm requirement, and they suggest
that surgery will not be available at all. (D.E. 36 at 6–8).

Defendants make separate arguments about why Plaintiffs lack standing to chal-
lenge HB805's provisions on hormones and surgery. Plaintiffs will address those, but de-
ciding standing on a treatment-by-treatment basis is not necessary. In a class action, pris-
oners can have standing to challenge the same overarching policy even if it ultimately
threatens to harm different class members in different ways. *See, e.g.*, *Harvard v. Inch*,
411 F. Supp. 3d 1220, 1237 (N.D. Fla. 2019) (plaintiffs had standing to challenge systemic
policy of solitary confinement even though "specific types of isolation at specific prisons"
varied); *Dunn v. Dunn*, 318 F.R.D. 652, 663 (M.D. Ala. 2016) (named plaintiffs had stand-
ing to allege systemic ADA violations even though their "disabilities, and the accommo-
dations they alleged they had been denied, are rather different"); *Buffkin*, 2019 WL
1282785, at *3–4 (plaintiffs had standing to challenge hepatitis C screening and treatment
policy even though they had already been diagnosed).

Here, all the alleged injury flows from the same statutory provision — the immi-
nent physical harm requirement — no matter which treatment a patient might need. Bas-
ing decisions for either hormones or surgery on imminent physical harm is unconstitu-
tional for the same reason: the standard is medically indefensible and puts patients at "an
unreasonable risk of serious damage to [their] future health." *Helling*, 509 U.S. at 35.

In any case, Plaintiffs have standing as to hormones for the reasons discussed
above. Defendants argue that Plaintiffs lack standing because their hormone therapy has
been continued. (D.E. 36 at 7; D.E. 32-1 at 6–7). But simply because a prisoner "receives
adequate care once, does not mean . . . they are not at an unreasonable risk when policies

9

and practices are deficient." *Hernandez*, 305 F.R.D. at 149 (finding standing). The allegations show that Plaintiffs face a real threat of having their hormone therapy cut off again. And class members who may need to initiate hormone therapy face the same problem. (D.E. 1 ¶¶ 70, 72, 92; D.E. 36 at 3, 7). Tellingly, while Defendants feel free to cite materials outside the complaint, such as Dr. Campbell's declaration, those materials do not disclaim subjecting class members to such "evaluations" in the future.

Plaintiffs have standing as to surgery for the same reasons. DAC denied Plaintiffs Inscoe and Frazier surgery expressly because of HB805. (D.E. 1 ¶¶ 88, 99). And even if DAC actually considers future requests, it will do so based on medically indefensible criteria.

Defendants also argue that Plaintiffs' allegations are too "abstract," and that "[a]llegations about the possibility of future Eighth Amendment violations, and anxiety about such speculative violations, do not suffice" for standing. (D.E. 32-1 at 9; D.E. 36 at 7–8). The Eighth Amendment, however, protects against "future harm" — prisoners can "successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery." *Helling*, 509 U.S. at 33. The alleged injury here is not speculative but real and ongoing: Plaintiffs can only qualify for medical care by satisfying an illegitimate standard. For prospective relief, Plaintiffs do not have to wait until the moment DAC again decides to deny them medical care. *See id.* (plaintiffs can seek relief from prison conditions "very likely to cause serious illness and needless suffering the next week or month or year").

DAC further argues that "any risk of imminent threat to the Plaintiffs' health is fully accounted for. As outlined in Dr. Campbell's affidavit, appropriate healthcare staff will continue to monitor . . . hormone replacement therapy and will authorize refills or

adjustments as indicated based on therapeutic goals and consistency with state law[.]" (D.E. 36 at 7). DAC misunderstands Plaintiffs' claim: making treatment decisions "consisten[t] with state law" is the central problem Plaintiffs seek relief from here.

**Redressability.** An injury is redressable if it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000). "[N]o explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing." *Equity in Athletics, Inc. v. Dep't of Educ.,* 639 F.3d 91, 100 (4th Cir. 2011). Even if a challenged risk of harm would only "be reduced to some extent" by a favorable ruling, a plaintiff will have standing. *Massachusetts v. E.P.A.,* 549 U.S. 497, 526 (2007).

Here, Plaintiffs allege that the "imminent physical harm" standard creates an unreasonable risk that they will be denied necessary medical care (D.E. 1 ¶¶ 3–5, 111–120), which creates the "substantial risk of serious harm" that the Eighth Amendment protects against. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). An injunction against that requirement would reduce the accompanying risk.

DAC argues that "treatment under the prior law is exactly the same as the treatment they are receiving under HB805." (D.E. 36 at 8). Not so. Plaintiffs' eligibility for both hormone therapy and surgery now depends *entirely* on the imminent physical harm standard. Before HB805, DAC did not use that standard, and DAC did not cut off hormone therapy to determine continued eligibility. (D.E. 1 ¶¶ 49–54).

Intervenors argue that "Plaintiffs' requested relief [would not] redress their fear that a future individualized assessment might recommend discontinuation of cross-sex hormones." (D.E. 32-1 at 8). Not so. If a clinician recommends discontinuing hormones for reasons grounded in sound medical practice, that would be far different from DAC

discontinuing hormones because of a medically baseless statute. *See Benjamin v. Oliver*, 800 F. Supp. 3d 1314, 1336 (N.D. Ga. 2025) (explaining that taking prisoners off hormones pursuant to a statute is "not a medical judgment" but "a policy judgment").

Defendants appear to confirm that DAC has reinstituted the blanket ban on gender-affirming surgery that this Court found unconstitutional in *Zayre-Brown*. DAC notes that it "has never approved or provided surgery as a gender affirming procedure either prior to or after the enactment of HB805." (D.E. 36 at 3). Intervenors say that DAC's policy "independently prohibits surgical gender transition procedures," and enjoining HB805 would not change that. (D.E. 32-1 at 10).

Defendants seem to think that if the Court enjoins HB805, DAC could still enforce the statute's requirements as a matter of policy — even though doing so would violate the Eighth Amendment for the *exact same reasons* the statute violates the Eighth Amendment. Federal courts do not permit that kind of recalcitrant behavior. *See New York Times Co. v. Dep't of Def.*, No. CV 25-04218 (PLF), 2026 WL 962252, at *4 (D.D.C. Apr. 9, 2026) (compelling compliance with injunction after the government implemented a revised policy maintaining "prohibitions contained in the original Policy that this Court held to be unconstitutional").

Relatedly, Intervenors argue that a different provision of the statute, N.C. Gen. Stat. § 143C-6-5.6(b), also forbids funding for gender-affirming surgery, and so an injunction against HB805 wouldn't change anything. (D.E. 32-1 at 9–10). That argument fails because, while the other provision may present similar problems, DAC has never purported to enforce that provision to deny gender-affirming care.[1] There is no live

---

[1] Throughout the *Zayre-Brown* litigation before this Court, DAC insisted that gender-affirming surgery was available under DAC policy and never claimed that state law forbade

controversy over that provision. If DAC changes course, the other provision would be unconstitutional for precisely the same reasons discussed here, and Plaintiffs would simply supplement their complaint.

Intervenors further contend that Plaintiffs lack standing on surgery "because they have not demonstrated their particular eligibility" for that procedure. (D.E. 32-1 at 11). But Plaintiffs cannot demonstrate eligibility if, as they allege, DAC won't meaningfully evaluate them to begin with. (D.E. 1 ¶¶ 22, 102). The Fourth Circuit has rejected the argument that "absent a doctor's recommendation, [a plaintiff] cannot show a demonstrable need for sex reassignment surgery," as she couldn't have "possibly satisfied that condition when, as she alleges, [defendants] have never allowed her to be evaluated by a GID specialist in the first place." *De'lonta v. Johnson*, 708 F.3d 520, 526 n.4 (4th Cir. 2013).

## II.     Plaintiffs' claims are ripe.

"The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form. . . . Analyzing ripeness is similar to determining whether a party has standing. To determine whether the case is ripe, we balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006) (cleaned up). A case is ripe when a plaintiff challenges a final, generally applicable rule that presently governs conduct or eligibility. *See, e.g.*, *id* at 318–21; *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992).

---

it. *See Zayre-Brown v. NCDPS,* No. 3:22-CV-191-MOC-DCK, 2024 WL 410243, at *8 (W.D.N.C. Feb. 2, 2024) (noting defendants' position "that gender reassignment surgery can be medically necessary in some cases"). Moreover, § 143C-6-5.6(b) can be fairly read to apply only to minors.

Intervenors argue that Plaintiffs' claims are unripe "to the extent they involve future changes in cross-sex hormone treatment or denial of as-yet unrequested surgeries." (D.E. 32-1 at 12). The argument fails largely for the same reasons that Defendants' standing arguments fail: four Plaintiffs have already experienced harm from medically-unsound alterations to their hormone treatments, all will remain subject to HB805's terms for prescription renewals, and two Plaintiffs were summarily denied gender-affirming surgeries because of HB805. (D.E. 1, ¶¶ 78–81, 87–88, 90–92, 96–99, 104–105). DAC's implementation of HB805 is real and ongoing. And requiring Plaintiffs to wait until they are injured yet again would cause them serious hardship. The case is therefore ripe for judicial review.

### III. Plaintiff Fraizer has not brought duplicative litigation.

"Generally, a lawsuit is duplicative of another one if the parties, issues and available relief do not significantly differ between the two." *Cottle v. Bell*, 229 F.3d 1142 (4th Cir. Aug. 14, 2000) (unpublished). "Claim splitting" bars duplicative actions against the same defendant, seeking the same relief based on the same claim or same nucleus of operative facts. *See Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621, 626–27 (D. Md. 2006), *aff'd*, 273 F. App'x 256 (4th Cir. 2008).

Plaintiff Frazier's prior *pro se* lawsuit is not duplicative of this class action suit because it sues different defendants, raises different issues, and seeks different relief. Unlike the present case, Ms. Frazier's *pro se* case seeks damages for a variety of injuries from defendants in their individual capacities, including sexual assaults and a prison door accident, and seeks individualized injunctive relief in the form of "sex reassignment

14

surgery." (D.E. 32-4). To the extent those claims concern HB805, they hinge entirely on Ms. Frazier's individual medical eligibility. [2]

In contrast, the instant case challenges the facial validity of HB805 on behalf of five named plaintiffs proposing to represent a class. It seeks indivisible declaratory and injunctive relief that would apply to all incarcerated people impacted by HB805's ban on gender affirming care. Moreover, even if the two cases are duplicative, barring Ms. Frazier's claim here would have little practical impact on this case. She would still qualify as a plaintiff class member, benefit from any class-wide relief, and participate as a fact witness. However, if the Court finds inappropriate overlap between the two actions, Ms. Frazier is willing to stay her individual claim concerning gender-affirming surgery.

### IV. The face of the complaint does not show a failure to exhaust available administrative remedies.

The PLRA states: "No action shall be brought with respect to prison conditions" under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. A failure-to-exhaust argument under the PLRA is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 212 (2007). A plaintiff is not required "to allege and demonstrate exhaustion in his complaint." *Id.* at 203. Dismissal is only appropriate "when the alleged facts in the complaint, taken as true, prove that the inmate failed to exhaust his administrative remedies." *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017). Moreover, in a class action brought under Rule 23(b)(2), prisoners can satisfy the PLRA through vicarious exhaustion: "when one or more class members has exhausted his administrative

---

[2] A *pro se* litigant may pursue her own personal claims only; she may not represent a class under Rule 23. *See Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (holding that a *pro se* litigant could not adequately represent a Rule 23 class because "the competence of a layman representing himself" is too limited "to allow him to risk the rights of others").

remedies with respect to each claim raised by the class." *Scott v. Clarke*, 64 F. Supp. 3d 813, 832 n.10 (W.D. Va. 2014) (cleaned up) (citing cases).

Here, Defendants' arguments fail under these basic rules. Intervenors say that the complaint fails to allege proper exhaustion (D.E. 32-1 at 16, 19), and DAC does not discuss the face of the complaint at all (D.E. 36 at 8–14).

Moreover, Plaintiffs' allegations do show proper exhaustion. Plaintiffs allege that "at least one Plaintiff has fully exhausted their available administrative remedies regarding the implementation and enforcement of HB805." (D.E. 1 ¶ 26). The complaint also provides further detail about Plaintiffs Inscoe and Frazier's efforts. (*Id.* ¶¶ 88, 99). Indeed, DAC concedes that "three of the five Plaintiffs have exhausted remedies concerning their hormone medication," and two Plaintiffs "exhausted a grievance regarding gender affirming surgery . . . ." (D.E. 36 at 4). The analysis can start and end there.

Intervenors also say that under Fourth Circuit precedent, Plaintiffs must "put on some evidence about availability of the administrative remedy process." (D.E. 32-1 at 16). To the extent that Intervenors suggest that Plaintiffs are relying on "unavailability" of the grievance process, they miss the mark. The cases referenced for that proposition dealt exclusively with summary judgment or determinations made after an evidentiary hearing. *See, e.g.*, *Griffin v. Bryant*, 56 F.4th 328, 330 (4th Cir. 2022); *Moss v. Harwood*, 19 F.4th 614, 621 (4th Cir. 2021). Ultimately, "a district court, at the pleadings stage, may not dismiss a claim based on the plaintiff's failure to affirmatively show exhaustion, even when the court has first allowed the plaintiff to address the issue." *Wilcox v. Brown*, 877 F.3d 161, 167 (4th Cir. 2017).

Further, though Plaintiffs have pled exhaustion and need not rely on any "unavailability" argument at this stage, the complaint also alleges that DAC stated in response to

Plaintiff Frazier's grievance that the issue of providing surgery was "[b]eyond control of agency," and that a grievance "shall be rejected at any level if it . . . [c]hallenges matters beyond the control of the Department." (D.E. 1 ¶ 99 (brackets original)). The PLRA doesn't require exhaustion of a remedy that is a "dead end," meaning "the relevant administrative procedure lacks authority to provide any relief." *Ross v. Blake*, 578 U.S. 632, 643 (2016) (quotation marks omitted); *see, e.g.*, *Younger v. Crowder*, 79 F.4th 373, 380 (4th Cir. 2023) (administrative scheme in which a "grievance will automatically be dismissed" did not have to be exhausted).

Defendants' other arguments rely on materials outside the complaint. That is improper on a Rule 12 motion — DAC's grievance process doesn't "give rise to a claim or [provide] the basis of an element of a claim," *Defs. of Wildlife v. Boyles*, 608 F. Supp. 3d 336, 345 (D.S.C. 2022), and PLRA exhaustion is not a jurisdictional requirement, *see Anderson v. XYZ Corr. Health Servs.*, 407 F.3d 674 (4th Cir. 2005), *abrogated on other grounds, Custis*, 851 F.3d at 362–63. But even if the Court looks outside the complaint, the result remains the same. DAC has submitted documents showing that three Plaintiffs exhausted as to hormones and two Plaintiffs exhausted as to surgery. (D.E. 36, Ex. 1A-D). The PLRA does not require more.

DAC notes that while Plaintiffs Inscoe and Frazier exhausted as to surgery, their grievances don't "refer to scheduled surgery or HB805 effects on a scheduled surgery." (D.E. 36 at 12).[3] But the PLRA doesn't require such details, *Jones*, 549 U.S. at 218, nor does DAC's grievance policy, which simply defines a grievance as "a written complaint . .

---

[3] This assertion overlooks the reality that Plaintiffs could not have possibly included a surgery date in their grievance, because the gravamen of their complaint is that their requested surgery was summarily denied without a proper assessment due to HB805.

. by an offender on the offender's own behalf concerning an action, incident, policy, or condition within a prison facility."[4]

### V. Plaintiffs plausibly allege that HB805 violates the Eighth Amendment.

The Eighth Amendment's prohibition of "cruel and unusual punishments" requires the government "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This guarantee accounts for mental health needs as well as physical ones. *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). An Eighth Amendment claim of inadequate medical care has two components: "the plaintiff must demonstrate that the defendant prison official acted with deliberate indifference (the subjective component) to the plaintiff's serious medical needs (the objective component)." *Gordon*, 937 F.3d at 356 (quotation marks omitted). Plaintiffs plausibly allege both components.

### a. Gender dysphoria is an objectively serious medical condition.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted). "Courts have routinely held that gender dysphoria is a serious medical need for purposes of the Eighth Amendment." *Huskins v. Fox*, No. 5:17-CV-58-FDW, 2018 WL 3660203, at *2 (W.D.N.C. Aug. 2, 2018) (collecting cases); *see also De'lonta*, 708 F.3d at 525; *Zayre-Brown v. NCDPS,* No. 3:22-CV-191-MOC-DCK, 2024 WL 410243,

---

[4] NCDAC Administrative Remedy Procedures, § .0301(c), https://perma.cc/NAZ4-39YE.

at *4 (W.D.N.C. Feb. 2, 2024); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019); *Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1340 (D. Idaho 2024).

Here, DAC has confirmed the named Plaintiffs' diagnoses of gender dysphoria and prescribed treatment including hormone therapy. (*See* D.E. 1 ¶¶ 12–16). Several Plaintiffs also seek gender-affirming medical care in the form of surgery; those requests were pending before passage of HB805 and summarily denied after the bill became law. (*Id.* ¶¶ 88, 99). Plaintiffs allege that improperly withholding treatment for gender dysphoria creates serious risks of short- and long-term physical and psychological harm. (*Id.* ¶¶ 46–48). *See Benjamin*, 800 F. Supp. 3d at 1330–32, 1335 (recognizing serious risks of hormone therapy withdrawal); *De'lonta*, 708 F.3d at 522 (potential harms from inadequately treated gender dysphoria constitute "an objectively serious medical need under the Eighth Amendment").

Intervenors do not dispute that gender dysphoria is an objectively serious medical condition; instead, they argue that Plaintiffs "have not alleged facts that are required for a determination of medical necessity." (D.E. 32-1 at 21). This argument misunderstands Plaintiffs' claim.

Prison officials violate the Eighth Amendment by denying medically necessary care, but they "also violate the Eighth Amendment where they fail to conduct a meaningful assessment of medical necessity but deny potentially necessary healthcare anyways." *Zayre-Brown v. NCDAC*, No. 3:22-cv-191-MOC-DCK, 2024 WL 3404620, at *3 (W.D.N.C. July 12, 2024) (citing *Edmo*, 935 F.3d at 800 n.22). Refusing to conduct meaningful evaluations for treatment — including treatment for gender dysphoria — "would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs." *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (en

19

banc). Here, Plaintiffs are not asking the Court to order any particular treatment for individual patients, but are challenging a statute that does not allow proper evaluations of medical necessity to occur in the first place. The Eighth Amendment protects against this kind of harm. *See Robinson*, 747 F. Supp. 3d at 1340; *Kingdom v. Trump,* No. 1:25-CV-691-RCL, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025).

Intervenors also argue that DAC's treatment of Plaintiffs "is not objectively medically unacceptable." (D.E. 32-1 at 20). They rely on *Clark v. Valletta*, 157 F.4th 201 (2d Cir. 2025), to argue that Plaintiffs "do not have 'a clearly established right to a specific course of gender-dysphoria treatment[.]'" (D.E. 32-1 at 21). But the *Clark* defendants did "not contest that [the plaintiff's] gender dysphoria [was] a serious medical condition[.]" 157 F.4th at 211. And *Clark* was discussing qualified immunity, which "is inapplicable" when a plaintiff "is seeking injunctive relief against Defendants in their official capacities." *Reid v. Clarke*, No. 7:16-CV-00547, 2017 WL 706352, at *1 (W.D. Va. Feb. 22, 2017). The objective aspect of qualified immunity analysis and the object prong of the Eighth Amendment share the word "objective," but are otherwise disparate concepts.[5]

Intervenors also point to *Skrmetti v. United States,* 605 U.S. 495 (2025) and *Anderson v. Crouch*, 169 F.4th474 (4th Cir. 2026), to argue that "[i]f legislatures can constitutionally ban or withdraw funding for such procedures under the Fourteenth

---

[5] The other cases cited are inapposite. *See Porter v. McCurdy*, No. 25-7020, 2026 WL 472976, at*1 (10th Cir. Feb. 19, 2026) (affirming dismissal of *pro se* case where plaintiff did not allege being denied hormone therapy after diagnosis); *Marcum v. Crews*, No. 25-5840 (6th Cir. Oct. 23, 2025) (D.E. 32-7 at 4) (denying injunction pending appeal where there was inadequate evidence that plaintiff had ever been diagnosed with gender dysphoria"); *Boone v. Caravajal*, No. 6:21-cv-3053, 2024 WL 3052064, at *12 (granting defendants' motion for summary judgment because they had been "advancing the [*pro se*] plaintiff's request for gender-affirming surgery pursuant to their policies").

Amendment's rational basis test, then prison officials do not run afoul of the Eighth Amendment by refusing to provide them." (D.E. 32-1 at 23). They cite no law to support their leap from Equal Protection analysis to Eighth Amendment analysis, nor could they. Access to healthcare in the community is not a constitutional right, but when the state incarcerates someone, it becomes constitutionally obligated to provide all medically necessary health care, *Estelle*, 429 U.S. at 103, regardless of whether insurance would cover that care in the community.[6]

Intervenors also rely on *Skrmetti* to urge that Plaintiffs have ignored "the fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in' the 'evolving field' of how to treat gender dysphoria." (D.E. 32-1 at 21 (quoting 605 U.S. at 525)). But Intervenors ignore that the *Skrmetti* majority's reasoning to that effect was explicitly limited to *minors*. 605 U.S. at 507, 511, 522–525. Nothing in the majority's opinion called into question the efficacy of gender-affirming care for adults; in fact, the Court itself noted that the law it was upholding did not impact care for adults. *Id.* at 507. The Court further noted that the WPATH standards have provided a standard of care for the treatment of gender-dysphoric adults since 1979. *Id.* at 504. Moreover, political controversy is not a defense under the Eighth Amendment, *see Benjamin*, 800 F. Supp. 3d at 1330–32, which was adopted specifically to protect politically unpopular people, *Johnson v. California*, 543 U.S. 499, 510–11 (2005).

---

[6] Moreover, fiscal considerations are not relevant to an Eighth Amendment claim for injunctive relief, so a legislature's funding decisions cannot be relevant either. *See Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) ("Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations.").

Tellingly, Intervenors cite no Eighth Amendment case that even mentions *Skrmetti*. And despite Intervenors' attacks on the WPATH Standards, those remain the "modern accepted treatment protocols for gender dysphoria . . .represent[ing] the consensus approach of the medical and mental health community . . . and hav[ing] been recognized . . . as the authoritative standards of care" in both carceral and non-carceral settings. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020) (citing *De'lonta*, 708 F.3d at 522–23). While these standards do not necessarily control the meaning of the Eighth Amendment, "[a]ccepted standards of care and practice within the medical community are highly relevant in determining what care is medically acceptable and unacceptable" under the Eighth Amendment. *Edmo,* 935 F.3d at 786.[7]

### b. Plaintiffs plausibly allege deliberate indifference.

"Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted)); *see Estelle*, 429 U.S. at 104–05. Prison officials show deliberate indifference when they "withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's

---

[7] The pre-*Skrmetti* cases that Defendants cite to support their claim that denying gender-affirming surgery does not amount to an Eighth Amendment violation conflicts with the Fourth Circuit's holding in *De'Lonta* that denial of surgery can give rise to such a claim. 708 F.3d at 526. In particular, *Gibson v. Collier,* 920 F.3d 212 (5th Cir. 2019) is an extreme outlier that applied "an incorrect, or at best outdated, premise: that there is no medical consensus that [gender-affirming surgery] is a necessary or even effective treatment for gender dysphoria." *Edmo*, 935 F.3d at 795 (cleaned up) (noting that *Gibson* relied on the outdated factual record of *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc) to uphold an outright ban on gender-affirming surgery in prisons).

condition significantly deteriorates." *Gordon,* 937 F.3d at 359. Prison policies that are not grounded in sound medical practice also demonstrate deliberate indifference. *See id.* at 361 (holding that "soundness of . . . reasons" underlying policy precluded summary judgment for prison officials); *Buffkin,* 2019 WL 1282785, at \*11 (enjoining statewide policy in part because it was "not justified by any medical reason").

Notably, prison policies that — as here — facially restrict access to gender-affirming care have been found to likely evince deliberate indifference. *See, e.g.*, *Benjamin*, 800 F. Supp. 3d at 1335 (enjoining statute where "Defendants' only justification for placing these Plaintiffs in increased danger of these side effects is that they do not want to 'use taxpayer money' to fund interventions they deem 'controversial'"); *Robinson*, 747 F. Supp. 3d at 1343 (enjoining blanket ban on hormone therapy).

Here, Plaintiffs allege that HB805 imposes deliberate indifference by creating medically unjustified barriers to care for gender dysphoria. The WPATH Standards do not require a patient to face imminent physical harm to qualify for any treatment, nor did DAC's longstanding policy before HB805. (D.E. 1 ¶ 117). Plaintiffs Kwiatkowski, Frazier, Snuggs, and Izzard all allege that — at the directive of Defendant Campbell, who serves under Defendant Dismukes — their hormone therapy was stopped for no sound medical reason, but only to see if they would suffer imminent physical harm. (*Id.* ¶¶ 70, 77, 90, 96, 103). Put differently, DAC intentionally deprived Plaintiffs of their prescribed medical care *in order to cause physical harm*, because that is the only way HB805 would allow them to continue receiving that care. Intervenors trivialize those allegations as "in the past." (D.E. 32-1 at 25).

Plaintiffs further allege that, because their prescriptions must be renewed periodically, they will again be subjected to the harmful "review" process, as will anyone else

23

who needs to continue or initiate hormone therapy (D.E. 1 ¶ 71). Additionally, Plaintiffs allege that mental and behavioral health concerns, no matter how dire, are not considered due to HB805's requirements. (*Id.* ¶¶ 73, 90–95). Plaintiffs Inscoe and Frazier were both informed that they would no longer be considered for surgery due solely to HB805. (*See id.* ¶¶ 88, 99).

Intervenors do not dispute any of this — rather, they assert that there can be no deliberate indifference because "Dr. Campbell's longstanding 'view on this issue' is that 'gender affirming surgery is never medically necessary for anyone,'" and therefore State Defendants "did not 'recognize[] that their actions were inappropriate under the circumstances." (D.E. 32-1 at 24 (brackets original)). This argument is meritless.

An Eighth Amendment claim does not fail simply because prison officials believe that they are acting lawfully. Deliberate indifference analysis looks to a defendant's awareness of risk of serious injury. *Farmer v. Brennan*, 511 U.S. 825, 829 (1994). On claims for injunctive relief, if "the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness[.]" *Id.* at 847 n.9. "Prison officials may not simply bury their heads in the sand and thereby skirt liability." *Makdessi v. Fields*, 789 F.3d 126, 129 (4th Cir. 2015). And regardless of DAC's "views," treatment decisions must still be based in reasoned medical judgment and adequately address prisoners' serious medical needs. *See De'lonta*, 708 F.3d at 526 (grossly inadequate care may violate Eighth Amendment). Here, Plaintiffs plausibly allege that DAC must be aware of the risks of harm created by HB805. (D.E. ¶ 116).

Moreover, DAC, and particularly Dr. Campbell, are abundantly aware of their responsibilities under the Eighth Amendment since they were defendants in *Zayre-Brown*,

where this Court held that Dr. Campbell's imposition of a de facto ban on gender-affirming surgery was unconstitutional. No. 3:22-CV-191-MOC-DCK, 2024 WL 1641795, at *3 (W.D.N.C. Apr. 16, 2024), *vacated as moot sub nom Zayre-Brown v. NCDAC.*, No. 24-6477, 2024 WL 4925046 (4th Cir. Nov. 25, 2024). That decision, which was never reversed on the merits, makes it even less plausible that Defendants are not currently aware of the risks posed by their enforcement of HB805.

Intervenors further contend that, due to N.C. Gen. Stat. § 143C-6-5.6(b), "the standard of care in North Carolina is that surgical gender transition procedures are never medically necessary in North Carolina." (D.E. 32-1 at 24). But the statute says nothing about standards of care and does not purport to regulate the medical field in any way. It only regulates how state funds can be spent. And contrary to Intervenors' suggestion, state policy preferences cannot limit the fundamental protections of the Eighth Amendment. *See, e.g., Benjamin*, 800 F. Supp. 3d. at 1336–39 (rejecting policy-based funding justifications for gender-affirming care ban held likely to constitute deliberate indifference).

**CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss and Intervenors' Motion for Judgment on the Pleadings.

Respectfully submitted this the 20th day of May, 2026.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore
N.C. State Bar #50849
Daniel K. Siegel
N.C. State Bar # 46397
Ivy A. Johnson
N.C. State Bar # 52228
P.O. Box 28004
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
Raleigh, NC 27611

25

T: (919) 354-5070
jmaffetore@acluofnc.org
dsiegel@acluofnc.org
ijohnson@acluofnc.org


*/s/ Elizabeth G. Simpson*
Elizabeth G. Simpson
N.C. State Bar # 41596
EMANCIPATE NC
P.O. Box 309
Durham, NC 27702
elizabeth@emancipatenc.org
919-682-1149

26

## **CERTIFICATE OF SERVICE**

I certify that on May 20, 2026, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will effect service on all counsel of record.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore

*Counsel for Plaintiff*

<u>**CERTIFICATE OF AI COMPLIANCE**</u>

Pursuant to the Court's standing order on the use of artificial intelligence, Docket No. 3:24-mc-104, I hereby certify that no artificial intelligence was employed in the research for the preparation of the foregoing document except for such artificial intelligence embedded in Westlaw. I further certify that every statement and citation to authority in the foregoing document has been checked by an attorney in this case or a paralegal working at their direction as to the accuracy of the proposition for which it is offered and the citation to authority provided.

*/s/ Jaclyn A. Maffetore*
Jaclyn A. Maffetore

*Counsel for Plaintiff*

28